# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

EDDIE LEE JACKSON  :  DOCKET NO. 5:15-cv-0072
   D.O.C. # 348513  :  SECTION P

VERSUS  :  JUDGE WALTER

NATHAN CAIN  :  MAGISTRATE JUDGE HAYES

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus [doc. 1] and Motion to Stay [doc. 42] filed by Eddie Lee Jackson, who is proceeding pro se in this matter. Jackson is an inmate in the custody of the Louisiana Department of Public Safety and Corrections and is currently incarcerated at Raymond Laborde Correctional Center in Cottonport, Louisiana. Nathan Cain, former warden of that facility, has filed a response in opposition to the petition and Jackson has filed a reply. Accordingly, the matter is now ripe for review.

This matter is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons **IT IS RECOMMEDED** that the Motion to Stay [doc. 42] be **DENIED** and that the petition for writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

# I.
## BACKGROUND

### A. Conviction

Jackson was charged by bill of information in the First Judicial District Court, Caddo Parish, Louisiana, with one count of second degree kidnapping, a violation of Louisiana Revised Statute § 14:44.1, and one count of simple arson of a vehicle with damage amounting to over $500, a violation of Louisiana Revised Statute § 14:52. Doc. 40, att. 3, pp. 28–30. The Louisiana Second Circuit Court of Appeal summarized the events giving rise to the charges as follows:

> On January 24, 2011, at approximately 2:00 a.m., deputies of the Caddo Parish Sheriff's Office were dispatched to the scene of an unoccupied burning vehicle near Cooper Road in Shreveport, Louisiana. It was later discovered that the vehicle, a 2006 silver Dodge Charger, was owned by Tracy Winslow, with whom the defendant had a prior 15–year romantic relationship. Tracy was not found at the scene of the burning vehicle and her family has not seen or heard from her since the night of January 23, 2011.

*State v. Jackson*, 132 So.3d 516, 519 (La. Ct. App. 2d Cir. 2014). The court went on to describe how Jackson and Winslow's romantic relationship had ended on or about November 24, 2010, when he repeatedly struck her on the head with a gun in front of their three minor children. *Id.* Shortly thereafter, according to witnesses at Jackson's trial, Winslow moved out of their shared home. *Id.* Around that time she also began a romantic relationship with a man named Larry Wiggins. *Id.* at 519 & note 5.

Jackson proceeded to a jury trial, where he was convicted as charged on both counts. Doc. 40, att. 22, pp. 99–100. On November 9, 2012, the trial court denied motions for a new trial and a post-verdict judgment of acquittal. *Id.* at 166–67. It then sentenced Jackson to a forty year term of imprisonment on the kidnapping conviction, without benefit of probation, parole, or suspension of sentence; and a concurrent ten year term on the arson conviction. *Id.* at 178–79.

## B. *Direct Appeal*

Jackson sought review of his convictions and sentences in the Louisiana Second Circuit Court of Appeal. Through counsel he raised assignments of error relating to the sufficiency of evidence, the introduction of other crimes evidence, and the excessiveness of the sentence. *Id.* at 206–25. Jackson also filed a supplement pro se brief, alleging ineffective assistance of counsel and seeking error patent review. *Id.* at 236–41. The Second Circuit found no merit to any of the above claims and affirmed the convictions and sentences.[1] *Jackson*, supra, 132 So.3d at 519–537. Jackson filed two writ applications with the Louisiana Supreme Court. Doc. 40, att. 23, pp. 2–20; *id.* at 112–27. The court denied same on September 19 and September 26, 2014. *State v. Jackson*, 148 So.3d 952 (La. 2014); *State v. Jackson*, 149 So.3d 260 (La. 2014). Jackson did not file a petition for writ of certiorari in the United States Supreme Court. Doc. 1, p. 3.

## C. *State Collateral Review*

Jackson filed a pro se motion to correct an illegal sentence in the trial court on October 7, 2014.[2] Doc. 40, att. 23, pp. 171–72. There he argued that the trial court had erroneously denied him parole eligibility for his entire sentence for the kidnapping conviction, when the applicable statute only mandates that parole should be denied for two years. *Id.* at 171. The trial court denied relief on November 26, 2014, noting that Louisiana Revised Statute § 14:44.1(C) instead provides that "**[a]t least** two years of the sentence imposed shall be without benefit of parole" and that the court was thus acting within its discretion to order that the entire sentence be served without benefit of parole. *Id.* at 191–92 (emphasis added in trial court's opinion). Jackson sought review of his

---

[1] The Second Circuit observed that the trial court had failed to impose a mandatory $15,000 fine for the simple arson conviction, but noted that it was not required to correct the sentence and so declined to remand the case for resentencing. *Jackson*, 132 So.3d at 537.

[2] For pro se filings by an inmate, this court uses the date that the pleading was surrendered for mailing, if available, as the date of filing. If that date is not provided, we look to the date that the pleading was received by the court.

motion to correct an illegal sentence from the Second Circuit and the Louisiana Supreme Court, both of which denied same. *Id.* at 226; doc. 40, att. 24, p. 70. The Louisiana Supreme Court's denial was issued on February 19, 2016. Doc. 40, att. 24, p. 70. As the respondent notes, Jackson continued to file numerous motions in the state courts after initiating his federal petition, infra. *See* doc. 40, att. 1, p. 16 n. 7.

### D. Federal Habeas Petition

The instant petition was filed on January 13, 2015. Doc. 1. It was initially dismissed with prejudice under Federal Rule of Civil Procedure 41(b), but was reopened on the Fifth Court's order after Jackson appealed that judgment. Docs. 11, 27; *see Jackson v. McCain*, 688 Fed. App'x 294 (5th Cir. 2017) (unpublished). In this petition Jackson raises the following claims:

1. The evidence admitted at trial was insufficient to support the second degree kidnapping conviction.

2. The sentence imposed for the second degree kidnapping is unconstitutionally excessive.

3. The trial court violated Jackson's right to due process by allowing other crimes evidence to be admitted.

Doc. 1, att. 2.

## II.
### STANDARDS ON HABEAS REVIEW

### A. Timeliness

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This period generally runs from the date that the conviction becomes final. *Id.* The time during which a properly-filed application for post-conviction relief is pending in state court

is not counted toward the one-year limit. *Id.* at § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n. 1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and the filing of the federal habeas application. *Rhines v. Weber*, 125 S.Ct. 1528 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d) the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the petitioner filed his federal habeas corpus petition.

### B. Exhaustion and Procedural Default

Exhaustion and procedural default are both affirmative defenses that may be considered waived if not asserted in the respondent's responsive pleadings. *E.g.*, *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994). However, the federal district court may also consider both doctrines on its own motion. *Magouirk v. Phillips*, 144 F.3d 348, 357–59 (5th Cir. 1998). Therefore we consider any assertions by respondent under these doctrines, in addition to conducting our own review.

### 1. Exhaustion of State Court Remedies

The federal habeas corpus statute and decades of federal jurisprudence require that a petitioner seeking federal habeas corpus relief exhaust all available state court remedies before

filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734, 740–41 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts "in a procedurally proper manner according to the rules of the state courts." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir. 1987). The exhaustion requirement is not satisfied if the petitioner presents new legal theories or entirely new factual claims in support of his federal habeas petition. *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983).

In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a). Thus, in order for a Louisiana prisoner to have exhausted his state court remedies he must have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner, based on the same general legal theories and factual allegations that he raises in his § 2254 petition.

### 2. *Procedural Default*

When a petitioner's claim is dismissed by the state court based on state law grounds, and those grounds are independent of the federal question and adequate to support the judgment, he may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or that review is necessary "to correct a fundamental miscarriage of justice." *Coleman v. Thompson*, 111 S.Ct. 2546, 2553–54, 2564 (1991) (internal quotations omitted). Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent

and adequate ground for the dismissal ("traditional" procedural default) or (2) the petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is considered to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). This is not a jurisdictional matter, but instead a doctrine "grounded in concerns of comity and federalism." *Trest v. Cain*, 118 S.Ct. 478, 480 (1997). The grounds for traditional procedural default must be based on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989). To serve as adequate grounds for a federally cognizable default, the state rule "must have been firmly established and regularly followed by the time as of which it is to be applied." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (internal quotations omitted).

### C. *General Principles*

When a state court adjudicates a petitioner's claim on the merits, this court reviews the ruling under the deferential standard of 28 U.S.C. § 2254(d). *E.g.*, *Corwin v. Johnson*, 150 F.3d 467, 471 (5th Cir. 1998). That statute provides that a writ of habeas corpus shall not be granted unless the state court's adjudication resulted in a decision that was (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d). Where a habeas court is faced with an unexplained decision on the merits, it "looks through" that decision to the last related state court decision that provides a relevant rationale and presumes that the unexplained decision adopts the same reasoning. The respondent may rebut the presumption by showing that the unexplained decision most likely relied on different grounds than the reasoned decision below. *Wilson v. Sellers*, 138 S.Ct. 1188 (2018). Our review, however,

ultimately encompasses "only a state court's decision, and not the written opinion explaining that decision." *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (internal quotations omitted); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning.") Even if the state court issues a summary denial of the claim, "the habeas petitioner's burden still must be met be showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. The petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786–87. A decision is only contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a [contrary result]." *Bell v. Cone*, 125 S.Ct. 847, 851 (2005) (quotations and citations omitted). As the Court recently emphasized, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' . . . Nor, of course, do state-court decisions, treatises, or law review articles." *Kernan v. Cuero*, 138 S.Ct. 4, 9 (2017) (internal citation omitted).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies only to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination. Instead, he must demonstrate that the factual determination was objectively unreasonable, a "substantially

higher threshold." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939 (2007). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Instead, a presumption of correctness attaches to the state court's factual determinations and the petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.
### LEGAL ANALYSIS

#### A. Timeliness

Jackson's convictions became final on December 26, 2014, when his time for seeking review in the United States Supreme Court expired. *See* Sup. Ct. R. 13. If the motion to correct illegal sentence constitutes collateral review, meaning that Jackson would be entitled to statutory tolling while it was pending, then no time accrued against § 2244(d)'s limitations period. *E.g.*, *McNeal v. Warden*, 2015 WL 4644729, at *2 (W.D. La. Aug. 4, 2015); *Bryars v. Cooper*, 2008 WL 3895472, at *3 (M.D. La. Aug. 21, 2008). If Jackson is not entitled to statutory tolling based on his motion to correct illegal sentence, then only 18 days accrued before he filed his habeas petition on January 13, 2015, and he is still well within § 2244(d)'s one-year time limit.

#### B. Exhaustion and Procedural Default/Motion to Stay

The respondent contends that the sufficiency of evidence claim is unexhausted, and thus subject to technical procedural default, because Jackson has changed the aspect of evidentiary support on which he focuses. Doc. 40, att. 1, pp. 18–20. However, the presence of additional factual allegations in the federal petition does not render a claim unexhausted, so long as the petitioner has presented the substance of his claim to the state court and the new allegations/evidence do not fundamentally alter the claim. *Vasquez v. Hillery*, 106 S.Ct. 617, 620 (1986); *Anderson v. Johnson*, 338 F.3d 382, 386–87 (5th Cir. 2002). Because Jackson's conviction for the same offense is

challenged under this claim and because the Second Circuit conducted such an exhaustive review of the evidence presented at trial, we deem the matter sufficiently exhausted through Jackson's direct appeal.

The respondent also contends that the excessive sentence claim is unexhausted, and thus subject to technical procedural default. He argues that the claim on direct appeal (1) was based on state law instead of federal constitutional grounds, (2) asks the court to review the "totality of circumstances" around Jackson's sentence, including specific factors not mentioned in the state court appeal, and (3) complains not just of the length of sentence but also of the denial of probation or parole for the entire term. Doc. 40, att. 1, pp. 26–27. However, on direct appeal Jackson clearly complained of the lack of parole eligibility. Doc. 40, att. 22, p. 221. He also alleged that the sentence was grossly disproportionate—the same test applied in our federal review, infra. *Id.* at 219–21. Accordingly, the fact that the claim presented to the state courts was based in part on state law, and mentioned state but not federal constitutional grounds, does not render the version presented here unexhausted and subject to procedural default.

Finally, the respondent claims that the other crimes evidence is unexhausted and subject to technical procedural default because it was not presented to the state courts as a violation of Jackson's federal constitutional rights, and because Jackson did not allege in the state courts that the other crimes evidence was based on unreliable hearsay. Doc. 40, att. 1, pp. 30–31. In his presentation of this claim on direct appeal, Jackson complained that the other crimes evidence was erroneously admitted because its probative value was outweighed by its potential prejudice and because the state had not proven that the defendant committed the prior bad acts. Doc. 40, att. 22, pp. 217–19. In his federal petition, Jackson likewise complains that some of the evidence was unfairly prejudicial and that the state failed to prove that he had committed the prior bad acts. Doc.

-10-

1, att. 2, pp. 7–8. The fact that he complains specifically of the use of hearsay in the state's proof does not fundamentally alter the nature of the claim. Additionally, he focuses on the January 23, 2011 text messages, which received special attention in his state court presentation of the claim. *See* doc. 40, att. 22, pp. 217–18. The arguments made to the state court were likewise sufficient to exhaust the only legal basis of this claim on federal habeas review: that the state court's ruling on the admissibility of such evidence resulted in a "denial of fundamental fairness" under the Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998).

Accordingly, all three claims raised in the instant petition have been exhausted, and decided on the merits, through Jackson's direct appeal. Now, however, Jackson moves for a stay of his habeas proceedings in order to exhaust an ineffective assistance claim, which he raised in a pending state application for post-conviction relief. Doc. 42.

The district court has discretion to issue a stay when faced with a § 2254 petition containing both exhausted and unexhausted claims under *Rhines v. Weber*, *supra*, in order to allow the petitioner to complete his state court remedies on the unexhausted claims. However, a court's discretion in this matter is not unlimited and the petitioner should show, among other things, good cause for his failure to exhaust all claims before coming to federal court. *Rhines*, 125 S.Ct. at 1534–35. In this matter, Jackson properly raised only his exhausted claims as part of his habeas petition. He has not shown good cause for his late attempt to raise the ineffective assistance claim, or for his decision to file this petition before he had completed his pursuit of post-conviction relief in the state courts. Accordingly, the stay should be denied. Jackson may instead attempt to raise his ineffective assistance claim through a successive § 2254 petition.

### C.  Merits Consideration

#### 1.  Insufficient evidence

Jackson first alleges that there was insufficient evidence to support his conviction of second degree kidnapping of Tracy Winslow. Doc. 1, att. 2, pp. 3–6.

A defendant's constitutional right to due process is violated when he is convicted of a crime without the state having met its burden of proof on every element of the offense.[3] *Jackson*, supra, 99 S.Ct. at 2787 (citing *In re Winship*, 90 S.Ct. 1068, 1073 (1970)). Such claims are decided by determining whether, "viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000) (internal quotations omitted; emphasis added). Thus, even though state law may require the exclusion of all reasonable hypotheses of innocence, a court on habeas review "may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

Under *Jackson*, both direct and circumstantial evidence can contribute to the sufficiency of evidence and circumstantial evidence alone may be enough to support the conviction. *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990). The habeas court must defer to the trial court's findings on issues of conflicting testimony and the weight of the evidence, resolving all conflicting inferences and credibility choices in favor of the verdict, and may not substitute its judgment for that of the factfinder's. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). Thus, under the standards of *Jackson* and § 2254,

---

[3] On federal habeas review, a court refers to the substantive elements of the offense as defined by state law. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995).

this court's review on sufficiency of evidence claims is "twice-deferential." *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012).

Jackson challenges his conviction for second degree kidnapping. Under Louisiana law, a kidnapping is (1) the forcible seizing and carrying away of any person from one place to another, or (2) the enticing or persuading of any person to go from one place to another, or (3) the imprisoning or forcible secreting of any person. La. Rev. Stat. § 14:44.1(B). Second degree kidnapping is a kidnapping committed under certain aggravating circumstances, including when the victim is imprisoned or kidnapped for 72 hours or more. *Id.* at § 14:44.1(A)(4). Second-degree kidnapping is a general intent crime. *State v. Cerde-Anima*, 119 So.3d 751, 759 (La. Ct. App. 5th Cir. 2013). General criminal intent exists under Louisiana law "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. Rev. Stat. § 14:10(2).

The Louisiana Second Circuit Court of Appeal denied this claim on the merits, after an exhaustive review of the evidence. *Jackson*, 132 So.3d at 519–32. It determined that there was sufficient evidence presented at trial to allow the jury to conclude beyond a reasonable doubt that Jackson forcibly seized, imprisoned, or secreted Winslow for 72 hours or more. *Id.* at 532.

Here Jackson complains that there was no physical evidence and no "positive statement identifying [him] as ever [having] physical custody of Tracy Winslow on the night she was allegedly kidnapped." Doc. 1, att. 2, p. 3. He asserts that no initial police report or missing person's report was filed by Winslow's report, and that no consideration was given to the fact that he was charged with burning a car on which he was paying the note. Doc. 41, p. 3; doc. 43, pp. 2–3, 5–6. He maintains that the only evidence came from Winslow's boyfriend, Larry Wiggins, and that

Wiggins's testimony was unreliable. Doc. 1, att. 2, pp. 3–4. He argues that the testimony from the state's other witnesses was "nothing more than hearsay and of a [speculative] nature." *Id.* at 5. He notes the lack of documentation of Winslow's family members reporting her missing and alleges that the "entire episode was orchestrated by Larry Wiggins and Tracy Winslow in an obvious effort to dump the defendant in prison for a long time." *Id.*

At trial the state established a history of domestic violence between Jackson and Winslow, through the testimony of several witnesses, as well as circumstantial evidence relating to Jackson's whereabouts and state of mind at the time of Winslow's disappearance. A summary of some of the most compelling evidence follows:

Two of Jackson and Winslow's minor children, S.W. and D.W., testified about the event that led Winslow to move out of the house with the children in November 2010. Doc. 40, att. 18, pp. 71–74, 91–97. They described how, during an argument related to something in Winslow's phone, Jackson hit Winslow in the head with a gun and then fired shots in the house. *Id.* Their testimony was corroborated by Corporal Kelly Reed, a crime scene investigator for the Caddo Parish Sheriff's Office, who searched the house after Winslow's disappearance and found two bullet holes Doc. 40, att. 20, pp. 58–60, 70–71.

Tamika Alphard testified that Winslow was a close friend and coworker for the past several years, and that she had also known Jackson for most of her life. Doc. 40, att. 18, pp. 123–26. She described an incident in December 2010, when Jackson drove up to confront Winslow while Alphard, Winslow, and Alphard's mother were at a local park on their lunch break. *Id.* at 131–32. Alphard stated that Winslow rolled down her window a crack to hear Jackson and that Jackson began jerking on Winslow's window and told her, "[D]on't play with me B-I-T-C-H, I'll break

your neck in 18 different places."[4] *Id.* at 133. Alphard also testified that Winslow had shown her threatening text messages from Jackson from around the same time period. *Id.* at 134. Tracy Winslow's cousin, Teressa Winslow, testified that Tracy Winslow had let her listen to a voicemail from Jackson in which he threatened her (Tracy Winslow) with physical harm. *Id.* at 154–56. Finally, someone using Jackson's computer visited a cell phone tracking site and read Winslow's emails multiple times after she moved out. Doc. 40, att. 20, p. 84–87, 91–100. On the evening of January 23, 2011, hours before Winslow's car was found, Jackson and Winslow argued over text message and Jackson demanded that she meet him in person. Doc. 40, att. 17, pp. 129–37. In one of those exchanges, after expressing anger that Winslow would not meet him, Jackson told her, "Go ahead, I know how to GPS your ass now." *Id.* at 132.

Frederick Taylor, a police officer and friend of Winslow's boyfriend Larry Wiggins, testified that he was with Wiggins and Winslow on the afternoon and evening of January 23, 2011, first at Wiggins's home and then at a football party at the home of Sabrina Harris. Doc. 40, att. 18, pp. 171–76. Chantelle Stephens, who was also at the football party, testified that Winslow kept receiving calls and texts while she was there and that she (Stephens) could occasionally hear a male voice on the other end. *Id.* at 181–86. She described Winslow's demeanor at this time as frustrated and agitated. *Id.* at 183–85. Sabrina Harris testified that Winslow's phone kept going off during the party, and that she could hear a male voice on the other end. *Id.* at 194–95. She stated that Winslow and Wiggins left her home around 11:00 pm that night. *Id.* at 196. D.W. also testified that his mother called him around 11:00 pm to say that she was on her way home. *Id.* at 103–04.

Wiggins testified that he had never met Jackson, but knew his voice because Winslow would occasionally put Jackson's calls on speaker. Doc. 40, att. 19, pp. 21–22, 36–37. He stated

---

[4] Alphard's mother, Cherrie Alphard, also described the event, including Jackson's specific threat to break Winslow's neck "in 18 different places." Doc. 40, att. 18, p. 145.

that he and Winslow parted ways after leaving Harris's house in Shreveport, with Winslow returning to nearby Oil City, where she lived with her mother. *Id.* at 34–36. Wiggins testified that he called Winslow on her cell phone to keep her company and keep her from falling asleep until she made it home. *Id.* He stated that Winslow told him she had arrived at her mother's and then he heard her opening the door to her car. *Id.* at 36. He then heard Jackson run up and start yelling at Winslow. *Id.* Wiggins began shouting Winslow's name, then heard a cracking sound and Winslow telling him that she would call him back. *Id.* at 37–38. She hung up her phone, and Wiggins did not hear from her again. *Id.* D.W., who was waiting for his mother inside the apartment, testified that he never heard from her after the 11:00 pm phone call, but that he did hear tires screeching out of the parking lot at some point after the call. Doc. 40, att. 18, pp. 104–05. Winslow's neighbor, Mariah Jackson, also testified that she saw Winslow's car speeding out of the parking lot with the headlights off that night, faster than she ever observed Winslow drive. *Id.* at 201–03, 207.

Caddo Parish Fire Department records reflected that first responders were first alerted to a vehicle fire on North Lakeshore Drive and Kuhn Road in Caddo Parish on January 24, 2011, at approximately 2:26 am. Doc. 40, att. 19, pp. 164–68; *see id.* at 191–92 (testimony of first responder). Donyell Malong, Jackson's friend, testified that Jackson began calling him around 1:30 or 2:00 am on January 24, 2011, claiming that his truck had broken down and asking for a ride. *Id.* at 118–20. Malong and his girlfriend, Trena Easter, drove out and came upon Jackson walking down Roy Road, outside of Oil City. *Id.* at 122–26. However, Malong did not see Jackson's truck. *Id.* at 126. During the investigation, Malong showed the fire marshal the place where he picked up Jackson and observed while the marshal walked to that point from where Winslow's vehicle had been found. *Id.* at 136–37. Malong and the fire marshal testified that the walk took about 20 minutes. *Id.* at 136–37; doc. 40, att. 20, pp. 176–78. Malong's testimony on

picking up Jackson and not seeing his vehicle was corroborated by Easter. Doc. 40, att. 19, pp. 147–57. It was also corroborated by Natasha Martin, Jackson's aunt, and who testified that Malong and Easter were spending the night at her house that night and woke her to say that they were going to pick up Jackson. Doc. 40, att. 20, pp. 28–33.

The state's witness, John Minor, was accepted as an expert in communications and described an analysis he had conducted to determine the locations of Jackson, Winslow, and Wiggins on the night of January 23, 2011, based on calls made from and received by their cell phones and how those calls "pinged" off of nearby cell towers. Doc. 40, att. 21, pp. 15–47. From that analysis he placed Jackson near Wiggins's residence in Shreveport between 6:18 pm and 10:23 pm, in Oil City (where Tracy Winslow resided) at 10:51 pm, traveling southeasterly at 11:27 and 11:31 pm, then back in Oil City at 11:44 pm, when he made a final call to Winslow's phone. *Id.* at 47–49, 52–55. Winslow's last cell phone communication, to Wiggins from 10:51 pm until 11:45 pm, terminated in Oil City, while Wiggins's end of the call remained at the tower in Shreveport that covers his residence; consistent with Wiggins's testimony that they remained on the phone with each other while she traveled from Shreveport back to her residence. *Id.* at 50–52. Jackson's calls to Malong, placed between 1:52 am and 2:24 am, all originated at a tower located .75 miles away from the place where Winslow's vehicle was found. *Id.* at 56–62.

Detective Leonard Scoggins of the Caddo Parish Sheriff's Office participated in an interview of Jackson on the afternoon of January 24, 2011, after Winslow's car had been found. *Id.* at 82–88. That interview was recorded on DVD and published to the jury at Jackson's trial. *Id.* at 87–93. There Jackson indicated that the last time he had spoken with Winslow was around 5:00 or 6:00 pm on the evening of January 23, and he made no mention of the text messages also sent that night. *Id.* at 95. Jackson also admitted that he had his phone with him the entire night and that

-17-

he was the only person who could have used his phone during the relevant time period. *Id.* at 95–96, 99. Jackson attempted to explain his presence at the crime scene by stating that someone had told him that a vehicle was burned and that he went to the area to investigate. *Id.* at 97–99; *see also id.* at 142–43 (testimony of Detective Kevin Fox).

The defense called only two witnesses: Jackson's sister, Tammy, and Pastor Sims. Sims testified that Winslow attended services at his church occasionally and that Jackson had called him to request relationship counseling with Winslow a couple of weeks before her disappearance. Doc. 40, att. 22, p. 25. He stated that they then attended two sessions, including one on the morning of January 23, 2011. *Id.* at 25–26. Sims admitted that he was familiar with rumors of domestic violence between the two, but was unaware of any specific incidents. *Id.* at 29. Tammy Jackson testified that, as far as she knew, Winslow and Jackson had a great relationship and that she was "extremely shocked" when they separated. *Id.* at 19. However, she admitted that she had no basis to contradict the testimony about instances of physical violence in the home or Winslow receiving threatening text messages and phone calls from Jackson after she moved out. *Id.* at 23–24.

A review of this evidence, under the standards described above, shows no basis for finding error in the state court's conclusion that the evidence was sufficient to support the verdict. The state presented ample circumstantial evidence, relating to (1) Jackson's history of domestic violence and other threatening behavior towards Winslow, (2) his proximity to the crime scene before the vehicle fire had been reported and his inability to present any witness to corroborate his story that he had received an early tip about the fire, (3) his anger at Winslow on the night she disappeared, and (4) his confrontation with her in the parking lot of her mother's apartment complex during her last phone call with Wiggins. The lack of physical evidence or eyewitnesses to the crime itself does not prevent the jury from concluding that Jackson was guilty beyond a

reasonable doubt, and Jackson's belief that the jury should have granted greater weight to the circumstantial evidence he highlights is not enough to show error to their verdict. Likewise, Jackson's challenges to issues such as Wiggins's ability to identify his voice affect the weight of evidence, a matter left to the jury's discretion and for which this court cannot substitute its own judgment on habeas review. Accordingly, Jackson shows no error to the Second Circuit's ruling and no right to habeas relief on this claim.

### 2.  Excessive sentence

Jackson next raises an excessive sentence claim under the Eighth Amendment, based on the sentence he received for the second degree kidnapping conviction. Doc. 1, att. 2, pp. 6–7.

Under federal law, no sentence is per se constitutional. *Solem v. Helm*, 103 S.Ct. 3001, 3009–10 (1983). Determination of prison sentences is a legislative prerogative that is the primary province of the legislatures rather than the courts. *Rummel v. Estelle*, 100 S.Ct. 1133, 1139–40 (1980). Accordingly, sentences that fall within statutory limits are granted substantial deference. Such a sentence will not be overturned on habeas review "unless it is grossly disproportionate to the gravity of the offense." *Lott v. Miller*, 2008 WL 4889650 at *9 (E.D. La. Nov. 3, 2008) (citing *Harmelin v. Michigan*, 111 S.Ct. 2680 (1991)).

In the Fifth Circuit, excessive sentence claims are analyzed under the framework set forth in *McGruder v. Puckett*, 954 F.2d 313 (5th Cir. 1992). First, the court weighs the gravity of the offense against the severity of the sentence. *Id.* at 316. Then, if the court determines that the sentence is grossly disproportionate to the offense, it compares the sentence in the instant case to sentences for similar crimes in the same jurisdiction and to sentences for the same crime in other jurisdictions. *Id.* If the court does not find that the sentence is grossly disproportionate to the offense, however, no further inquiry is required and the court instead "defer[s] to the will of" the

legislature. *United States v. Gonzales*, 121 F.3d 928, 942–43 (5th Cir. 1997), *overruled in part on other grounds by United States v. O'Brien*, 130 S.Ct. 2169, 2180 (2010), *as stated in United States v. Johnson*, 398 Fed. App'x 964, 968 (5th Cir. 2010). As the Supreme Court has noted, the disproportionality inquiry is inherently subjective. *Rummel*, 100 S.Ct. at 1138–39. Outside of the capital punishment context, successful proportionality challenges are "exceedingly rare." *Id.*

The Louisiana Second Circuit Court of Appeal denied this claim on the merits, concluding that the trial court had not abused its "vast discretion" in sentencing and that, based on the details and impact of the offense, Jackson's criminal history, and his lack of remorse, the sentence "does not shock the sense of justice and is not excessive." *Jackson*, 132 So.3d at 535–36. Here Jackson contends that the sentence, which he acknowledges was within the statutory range for second degree kidnapping, was nonetheless excessive because 1) his conviction was based on insufficient evidence, 2) he was a first-time offender, 3) no one was physically injured in the case, and 4) the trial court "abused its discretion by not following the sentencing guidelines and knowing the penalty provisions for the crime the defendant was being sentenced under." Doc. 1, att. 2, pp. 6–7. He provides no support for the fourth allegation and we have already considered the first allegation *supra*. Accordingly, we focus our proportionality inquiry only on the second and third allegations, as well as the other considerations noted by the Second Circuit.

Jackson maintains that his pre-sentence investigation report showed that he was a first-time offender. Doc. 1, att. 2, p. 6. Although the bulk of the state's argument of prior bad acts related to his unadjudicated instances of domestic violence, the state also noted at sentencing that Jackson had a prior felony conviction for cocaine possession. Doc. 40, att. 22, pp. 175–76. The state admitted that this conviction was too old to use for a multiple offender adjudication, but maintained that the court should still take it into consideration. *Id.* Louisiana's habitual offender statute

provides that a prior non-violent felony conviction cannot be used to enhance a sentence under a multiple offender bill if the term of supervision or imprisonment for the prior offense expired more than five years before the commission of the current offense. La. Rev. Stat. § 15:529.1(C)(1). However, Jackson was not billed as a multiple offender. There is no such time limitation under Article 894.1 of the Louisiana Code of Criminal Procedure, on the extent to which prior convictions may be considered at sentencing. Additionally, when imposing a sentence within the statutory limits a court may consider all prior criminal activity, including prior arrests and suspicions of criminal activity. *State v. Jones*, 724 So.2d 810, 811 (La. Ct. App. 2d Cir. 1998). Accordingly, Jackson shows no error in the extent to which the trial court determined that he did have a criminal history, based on the cocaine possession conviction and/or his history of domestic violence, or the extent to which it considered this history relevant.

Jackson also alleges that his sentence is excessive in light of the fact that there was no evidence of physical harm. The court did note the "deliberate cruelty" involved in Jackson's actions, though it is not clear if this reference applies to his history with Winslow or her disappearance. Doc. 40, att. 22, p. 178. However, it also focused on the impact of Winslow's disappearance. At the sentencing hearing it heard testimony from Detective Keith Fox of the Caddo Parish Sheriff's Office, who described his investigation into Winslow's disappearance and the lack of any leads despite the Sheriff's Office's exhaustive attempts to locate her. Doc. 40, att. 22, pp. 146, 149–51.  It also heard testimony from Winslow's mother, who was recovering from a leg amputation, and from relatives who spoke to the impact on Winslow and Jackson's three minor children and on Jackson's two children from a previous relationship, who had resided with her for several years while she and Jackson were living together. *Id.* at 109–61. Jackson did not make any statement on his own behalf. *Id.* at 168. Accordingly, the court justified imposition of the

maximum sentence without benefit of probation, parole, or suspension of sentence by finding that Jackson's actions had resulted in significant losses to Winslow and her loved ones, and that any lesser sentence would deprecate the seriousness of his crimes. *Id.* at 178–79. It also noted, generally, Jackson's criminal history and lack of genuine remorse. *Id.* at 178.

The respondent asserts, and Jackson fails to refute, that Winslow has still not been seen or heard from since January 23, 2011. Doc. 40, att. 1, p. 30. Jackson's conviction thus represents his responsibility for Winslow's disappearance at age 31,[5] following days and weeks of threats against her, and for her absence from the lives of an ailing parent and her growing children. He cannot show that a 40 year term of imprisonment without benefits, which is still within statutory guidelines, was grossly disproportionate, no matter how remote his prior felony was or how little is known of what happened to Winslow after her disappearance. Accordingly, Jackson shows no error to the state court's ruling and no right to federal habeas relief.

### 3. *Admission of other crimes evidence*

Finally, Jackson complains that he was denied a fair trial by the admission of other crimes evidence. Doc. 1, att. 2, pp. 7–8.

A petitioner is only entitled to habeas relief from a state court's evidentiary rulings if he can show that the rulings resulted in a "denial of fundamental fairness" under the Due Process Clause. *Neal*, supra, 141 F.3d at 214. Accordingly, the petitioner is only entitled to habeas relief if he shows (1) that the trial court's ruling was erroneous and (2) that the admitted evidence was a "crucial, highly significant factor" in his conviction. *Id.*

The Louisiana Second Circuit Court of Appeal denied this claim on the merits, finding that the trial court had correctly concluded that the prior bad acts evidence was admissible under

---

[5] Winslow's age was provided by her mother at the sentencing hearing. Doc. 40, att. 22, p. 109.

Louisiana Code of Evidence article 404(B), in order to show Jackson's motive, intent, and plan to commit the crimes charged, and that the probative value of this evidence was not substantially outweighed by the risk of undue prejudice. *Jackson*, 132 So.3d at 532–34. It also ruled that Jackson's text messages from January 23, 2011, were properly admitted. *Id.*

Here Jackson objects to the state's introduction of "other crimes evidence," specifically the testimony relating to prior incidents of domestic violence, threats against Winslow, and efforts to track her cell phone. Before the trial, the state filed notices of its intent to introduce such evidence pursuant to Louisiana Code of Evidence article 404(B).[6] Doc. 40, att. 9, pp. 185–86; doc. 40, att. 10, pp. 3, 207; doc. 40, att. 11, p. 50. A hearing was held to determine the admissibility of the Rule 404(B) evidence on March 29 and April 11, 2012, under the requirements set forth in *State v. Prieur*, 277 So.3d 126 (La. 1973). Doc. 40, att. 11, pp. 190–259; doc. 40, att. 12, pp. 3–54. The trial court then ruled that all of the evidence was admissible under Article 404(B) and that the probative value of this evidence outweighed its prejudicial effect. Doc. 40, att. 12, pp. 49–50. Jackson alleges that the trial court erred in its determination because Winslow never appeared at any court hearing to describe his prior bad acts. However, other witnesses to those events – namely, their children and coworkers who witnessed Jackson threaten to break her neck – did testify as to these incidents, as shown supra. Accordingly, Jackson fails to show that the trial court erred in determining that the prior bad acts occurred.

Jackson also focuses on the introduction of his January 23 text messages to Winslow. He argues generally that "[t]he language introduced portrays him as jealous and possessive and vulgar and was only introduced in an attempt to diminish his moral character." Doc. 1, att. 2, pp. 7–8; *see*

---

[6] Under that article, like the equivalent Federal Rule of Evidence 404(B), prior bad acts of a person are not admissible in order to show that the person acted in conformity therewith, but may be admitted as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, [and] absence of mistake or accident." La. C. E. art. 404(B).

doc. 40, att. 17, pp. 100–42 (introduction of text messages at trial, through testimony of Verizon Wireless records custodian). Specifically, the state introduced text messages sent from Jackson to Winslow on the evening of January 23, 2011, beginning with Jackson's demand that Winslow come pick up their youngest child and escalating into expletive-laden threats that referenced her relationship with Wiggins. *Id.* at 121–37. The messages were highly probative because they showed Jackson's threats to Winslow and anger at her right before her disappearance. Given the relevance of these messages and the 404(B) evidence already deemed admissible regarding Jackson's threats and use of force against Winslow, he cannot show that the trial court erred in its determination that the text messages' potential for prejudice did not outweigh their probative value.[7] Jackson fails to identify a mistake with regard to any evidentiary ruling, let alone that the ruling deprived him of due process. Accordingly, he shows no error to the Second Circuit's decision and is not entitled to federal habeas relief on this claim.

## IV.
### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the instant application be **DENIED** and **DISMISSED WITH PREJUDICE** and that the Motion to Stay [doc. 42] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

---

[7] The Second Circuit also stated that the text messages contradict a claim made by Jackson, during an interview with Scoggins, that he did not know that Winslow was seeing someone else. *See Jackson*, 132 So.3d at 520–21, 532–34. The statement was not referenced in Scoggins' testimony, and so we cannot determine if this assertion was in the portion of the interview that was recorded and played for the jury. *See* doc. 40, att. 21, pp. 92–121.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

**THUS DONE** in Chambers this 25th day of April, 2018.

_____

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE